Jack Meyerson, Esq. (No. 781990)
Matthew Miller, Esq. (043462010)
MEYERSON & MILLER
1600 Market Street, Suite 1305
Philadelphia, PA 19103
(215) 972-1376
jmeyerson@meyersonlawfirm.com
mmiller@meyersonlawfirm.com
*Attorneys for Plaintiff Sharon Hartz*

| | | |
|---|---|---|
| SHARON HARTZ | : | U.S. DISTRICT COURT FOR |
| | : | THE DISTRICT OF NEW |
| Plaintiff, | : | JERSEY |
| | : | |
| v. | : | DOCKET NO.: |
| | : | |
| THE WHISTLEBLOWER LAW FIRM, LLP, | : | CIVIL ACTION |
| NATALIE KHAWAM CASE & | : | |
| ASSOCIATES, PLLC, | : | NEGLIGENCE, BREACH OF |
| NATALIE KHAWAM CASE, ESQ., AND | : | CONTRACT, BREACH OF |
| ALAN RIPKA, ESQ., | : | FIDUCIARY DUTY, AND |
| | : | FAILURE TO SUPERVISE |
| Defendants. | : | |
| | : | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Sharon Hartz ("Hartz"), complaining of Defendants The Whistleblower Law Firm, LLP ("Whistleblower Law Firm"), Natalie Khawam Case & Associates, PLLC ("Khawam Law Firm"), Natalie Khawam Case, Esq., ("Attorney Khawam"), and Alan Ripka, Esq., ("Attorney Ripka") hereby avers as follows:

## NATURE OF ACTION

1.      This is a legal malpractice, breach of contract, and failure to supervise action arising from the representation by Attorney Khawam, Attorney Ripka, the Whistleblower Law Firm of Tampa, Florida and Washington, D.C., and the Khawam Law Firm of Washington, D.C. for their failure to preserve and initiate claims against the United States Army, arising from the scheme to defraud Gold Star families orchestrated by Caz Craffy, which defrauded Plaintiff of

1

the life insurance proceeds she received as a result of the death of her son, Sgt. Thomas Francies Anastasio, II, while serving in the United States Army.

2.      Plaintiff's son, Thomas Anastasio, died on January 6, 2019, at the age of 27. He was a specialist in the National Guard and was set to deploy with his company to Djibouti in February of that year. Shortly following his death, the United States Army Casualty Assistance Office ("USACAO") referred and introduced Plaintiff to Major Caz Craffy ("Craffy"), a Financial Counselor with the U.S. Army's Survivor Outreach Services Program ("SOS"), who was assigned to assist her in fulfilling the requirements necessary to receive a payout of Sgt. Anastasio's life insurance proceeds.

3.      Craffy proceeded to advise Plaintiff as to investment of the proceeds of her deceased son's life insurance and her other life and retirement savings through two private financial securities investment firms, Newbridge Securities Corporation ("Newbridge Securities") and Monmouth Capital Management, LLC, ("Monmouth Capital") from which he personally earned commissions which resulted in substantial financial losses to Plaintiff.

4.      As a Financial Counselor with the USACAO and SOS, Craffy, was only permitted to provide basic information and education with respect to survivor benefits, budgeting, savings plans, health care, insurance options, and retirement planning options. He was prohibited from providing personal opinions regarding survivors' benefits decisions and managing and investing survivors' benefits proceeds and he was prohibited from simultaneously working as an investment advisor affiliated with private securities firms.

5.      Craffy acted without any proper supervision from the United States Army, USACAO, or SOS, and perpetrated a scheme to defraud Plaintiff and at least 23 other Gold Star families of over $3.4 million all while employed as a Financial Counselor with the USACAO.

6.      Eventually, in 2022, Craffy's activities came to light and he was criminally prosecuted for his fraudulent scheme. During the course of this criminal prosecution, Plaintiff was advised by persons involved in the investigation and prosecution that she had viable personal civil claims arising out of Craffy's fraudulent activities, and she was referred by U.S. Army personnel to Defendant Attorney Khawam, who she was told had prior experience representing United States Military families.

7.      Defendant Attorney Khawam had Plaintiff execute a retention agreement with a 40% contingent fee for her to initiate litigation against the United States Army for its failure to supervise Craffy.

8.      Despite agreeing to represent Plaintiff and to initiate litigation against the United States Army, Defendant Attorney Khawam took no action to preserve Plaintiff's right to sue the U.S. Army for its failure to supervise Craffy, but instead devoted her energies to obtaining self-promoting publicity for herself from various national news services, including but not limited to the Washington Post, NBC, and Insider Edition, while touting her aggressive representation of defrauded Gold Star families, including Plaintiff.

9.      Despite agreeing to initiate litigation on behalf of Plaintiff against the United States Army, Defendant Attorneys Khawam and Ripka failed to submit the requisite Standard Form 95 or other written notice to preserve Plaintiff's claim against the United States Army and failed to initiate a lawsuit against the Army within the statute of limitations. Thereafter, Defendant Attorneys Khawam and Ripka abandoned their representation of Plaintiff.

**<u>JURISDICTION AND VENUE</u>**

10.    This Court has diversity jurisdiction pursuant to 28 U.S.C §1332 in that the dispute is between citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) as this is the judicial district in which a substantial part of the events giving rise to these claims occurred.

## PARTIES

12.    Plaintiff Sharon Hartz ("Ms. Hartz") is an adult citizen of the State of New Jersey residing at 412 Hickory Avenue, Paramus, New Jersey 07652. Ms. Hartz has been employed by UNGRIA INTERNATIONAL, Inc. as a paralegal and office manager for approximately 37 years.

13.    Defendant The Whistleblower Law Firm, LLP ("Whistleblower Law Firm") is a law firm with offices located at 400 N. Tampa Street, 15th Floor, Tampa, Florida 33602 and 601 Pennsylvania Avenue NW, Suite 900, Washington, D.C. 20004.

14.    Defendant Natalie Khawam Case & Associates, PLLC ("Khawam Law Firm") is a law firm with offices located at 601 Pennsylvania Avenue NW, Suite 900, Washington, D.C. 20004.

15.    Defendant Natalie Khawam Case, Esq. ("Attorney Khawam") is an attorney licensed to practice in the State of Florida. She holds herself out as an expert in military medical malpractice, qui tam, corporate fraud, and veterans' benefits litigation. Defendant Attorney Khawam founded Defendants Whistleblower Law Firm and Khawam Law Firm and, at all times relevant hereto, was a partner of Defendant Whistleblower Law Firm. Upon information and

belief, Attorney Khawam maintains an office located at 601 Pennsylvania Avenue NW, Suite 900, Washington, D.C. 20004.

16.     Defendant Alan Ripka, Esq, ("Attorney Ripka") is an attorney licensed to practice in the State of New York. At all times relevant hereto, Attorney Ripka was a senior partner of Defendant Whistleblower Law Firm. As senior partner, he was responsible for supervising Defendant Attorney Khawam and was copied on numerous communications about Plaintiff's and other Gold Star clients' cases. Upon information and belief, Defendant Attorneys Ripka and Khawam have a long-standing professional relationship, having worked together at Khawam Ripka, LLP in addition to Defendant Whistleblower Law Firm. Upon information and belief, Attorney Ripka also maintains an office located at 601 Pennsylvania Avenue NW, Suite 900, Washington, D.C. 20004.

## OPERATIVE FACTS

17.     Plaintiff's son Thomas Francies Anastasio, II, enlisted in the Jersey City National Guard, began active duty on December 8, 2018, and was preparing to deploy to Djibouti in January 2019, when he died suddenly in his sleep from an undetected heart condition, hypertrophic cardiomyopathy.

18.     Prior to his deployment, Sgt. Anastasio was careful to ensure that his mother, Plaintiff Sharon Hartz, and two younger siblings would be taken care of in his absence. He took great pride in his military service and was looking forward to serving his country overseas.

19.     Immediately following his tragic death, Plaintiff was contacted by Sgt. Marte, a Casualty Assist Officer with the USACAO. Sgt. Marte visited Plaintiff's home and advised that he would assist with all necessary arrangements related to her son's death.

20.    Sgt. Marte arranged for her son's funeral and promotion to the rank of sergeant, which included a full ceremony prior to his burial.

21.    The day after her son's funeral, Sgt. Marte contacted Ms. Hartz about connecting her with USACAO Financial Counselor, Caz Craffy, to coordinate her receipt of survivor benefits, including her son's $400,000 life insurance policy.

22.    Plaintiff was entitled to receive a $100,000 payment from the U.S. Military as her son's surviving beneficiary, as well as his Servicemembers Group Life Insurance program benefits.

23.    In total, Plaintiff received $500,000 in survivor's benefits from the U.S. Military.

24.    Despite having had her own financial advisor for many years, Sgt. Marte advised that Ms. Hartz could not receive the insurance policy benefits without first meeting with Craffy.

25.    Ms. Hartz expressed to Sgt. Marte that she needed time to rest following the emotionally taxing burial of her son; however, Sgt. Marte insisted that she was required to meet with Craffy within the following week in order to receive the benefits disbursement.

26.    On January 22, 2019, Ms. Hartz and her sister were driven by Sgt. Marte two hours from her home in Paramus, New Jersey to Joint Base McGuire-Dix-Lakehurst in Ocean and Burlington Counties, New Jersey. Once they arrived, Ms. Hartz was introduced to Craffy, who explained that his services as a financial counselor with the U.S. Army were a special benefit conferred upon her due to the loss of her son. Craffy stressed that Ms. Hartz was a member of the "Army family" and convinced her to allow him to manage a majority of her $400,000 survivor life insurance benefits.

27.     As a financial counselor with the U.S. Army, Craffy was precluded from employment with investment firms, such as Monmouth Capital and Newbridge Securities, and was prohibited from managing or investing Gold Star families' benefits and money.

28.     Craffy visited Ms. Hartz at her Paramus, New Jersey home, seemingly taking interest in her home renovation projects and children's college aspirations.

29.     After cultivating rapport with Ms. Hartz and boasting that with his management Ms. Hartz could "double her savings in 10 years," Craffy convinced her to transfer her other savings accounts, including her IRA, to him in addition to the life insurance benefits he already managed.

30.     In total, Craffy managed $500,000 of Ms. Hartz life insurance benefits and savings, the majority of which he invested for Plaintiff through Newbridge Securities.

31.     In November 2021, when Ms. Hartz requested funds for a home renovation project, Craffy made withdrawals from Ms. Hartz's IRA. When Ms. Hartz expressed concern that the monies had been withdrawn from her IRA as opposed to her other investment accounts, Craffy falsely advised that she would not incur taxes and penalties on the withdrawals.

32.     Craffy made high-risk trades with Ms. Hartz's and other Gold Star Families' modest savings, on which he personally received significant commissions to fund his sprawling $2.1 million home, luxury vehicles, and lavish vacations.

33.     As a result of Craffy's fraudulent scheme, Ms. Hartz lost over $200,000 from her personal savings and her son's life insurance policy.

34.     In addition, Ms. Hartz lost the opportunity to earn interest on her savings, was forced to refinance her home to afford her mortgage resulting in a 3% increase in her interest

rate, lost the ability to pay for her children's college education, and incurred an approximately $70,000 IRS tax bill.

35.     Ms. Hartz's retirement plans were completely upended by Craffy's fraudulent scheme. She had planned to retire in 2029; however, this plan is no longer financially feasible and she does not know when retirement will be a possibility.

36.     In or around November 2022, Ms. Hartz learned of a potential claim against the United States Army when she was contacted by U.S. Army Special Agent Christopher Dowling and informed of the Army's investigation of Craffy's fraudulent activities while serving as a Financial Counselor for the USACAO and SOS.

37.      Special Agent Dowling encouraged Ms. Hartz to speak with an attorney. When Ms. Hartz inquired whether he knew of an appropriate attorney, he suggested Ms. Hartz contact Defendant Attorney Khawam.

38.     Defendant Attorney Khawam had recently gained celebrity through her representation of the family of Vanessa Guillen, a young servicewoman who was killed by her supervisor at Fort Hood, Texas, in 2020.

39.     Ms. Hartz retained Defendants Attorneys Khawam and Ripka and the Whistleblower Law Firm in or around December 2022.

40.     Defendants Attorneys Khawam, Ripka, and the Whistleblower Law Firm agreed to pursue a civil action against the United States Army for failing to supervise Craffy, as well as FINRA arbitration against the two private brokerage firms, Newbridge Securities and Monmouth Capital in exchange for a 40% contingent fee.

41.     Defendants fee agreement violated New Jersey Rule 1:21-7, which stipulates that the maximum contingency fee percentage an attorney is permitted to charge is 33 1/3% on the first $750,000 recovered.

42.     Defendant Attorneys Khawam, Ripka, and the Whistleblower Law Firm also engaged at least five (5) other Gold Star victims to represent them in civil claims and FINRA arbitration rising from Craffy's fraudulent scheme. As of the date of this filing, Defendant Attorneys never filed claims on behalf of any of the Gold Star families they signed-up as clients.

43.     On January 10, 2023, Special Agent Dowling contacted Ms. Hartz and notified her that Craffy was no longer employed by the United States Army and that he had been barred by FINRA from trading securities.

44.     Soon after her retention, Defendant Attorney Khawam quickly garnered press attention through the publication of a Washington Post article on February 28, 2023, which featured Plaintiff and other victims of Craffy's fraudulent scheme.

45.     Defendant Attorney Khawam posted the article to her Facebook page writing in part, "I'm honored to have my case on financial fraud featured on the front page of The Washington Post! I work very hard to help get my clients Justice."

46.     Despite her self-aggrandizement and pursuit of publicity, Defendant Attorney Khawam failed to take action to preserve Plaintiff's failure to supervise claim against the United States Army, as required by the Federal Tort Claims Act (FTCA).

47.     The FTCA requires that a claimant provide written notice of the claim within two years of accrual. Typically, notice may be given through submission of Standard Form 95.

48.     Pursuant to 28 U.S. Code § 2401(b), a tort claim against the United States is forever barred unless it is presented in writing to the appropriate federal agency within two (2)

years after the claim accrues or unless action is commenced within six (6) months after notice of final denial of the claim by the agency to which it was presented. Accordingly, Defendants had until November 2024 to provide the United States Army written notice of Ms. Hartz's claim.

49.    Between February and May 2023, Defendant Attorney Khawam and Whistleblower Law Firm staff arranged a series of interviews with Inside Edition and NBC that featured Ms. Hartz and other Gold Star victims. During this period, Attorney Khawam took no action to initiate a civil action against the United States Army on Ms. Hartz's behalf and, most significantly for this lawsuit, never submitted Standard Form 95 or provided other written notice to the U.S. Army on behalf of Plaintiff or any of her other Gold Star clients.

50.    On July 6, 2023, Caz Craffy was indicted on six counts of Wire Fraud, one count of Securities Fraud, one count of False Statement on a Loan Application, one count of Acts Affecting Personal Financial Interests, and one count of False Statements.

51.    On July 7, 2023, the Securities and Exchange Commission filed a complaint against Craffy alleging violations of the Securities Act Section 17(a), Exchange Act Section 10(b) and Rule 10b-5 Thereunder, and Regulation Best Interest's General Obligation.

52.    In his role as a U.S. Army Financial Counselor, Craffy was both assigned to work with specific Gold Star families, such as Plaintiff's, and sought out potential victims through his access to internal military databases.

53.    The U.S. Army prohibited Craffy and other financial counselors from maintaining employment with securities firms.

54.    Craffy did not disclose his employment with Monmouth Capital and Newbridge Securities to the U.S. Army.

55.    Craffy did not disclose to Plaintiff or his other Gold Star victims that the U.S. Army was not affiliated with the two securities firms.

56.    In order to open an investment account and trade securities with the two securities firms, Plaintiff was required to complete forms describing her securities investment experience and investment objectives. Craffy completed these forms and, on at least one occasion, Plaintiff notified Craffy of a misrepresentation of her investment knowledge. Craffy described Ms. Hartz as a knowledgeable and experienced investor. When Ms. Hartz objected to the inaccurate description, Craffy urged her to sign, suggesting that she "knew what she was doing" and that he would "bring her up to speed," and she acquiesced.

57.    As a financial advisor with the two securities firms, Craffy was prohibited from exercising discretionary authority over Plaintiff's accounts. In other words, Craffy was required to obtain authorization from Ms. Hartz prior to executing trades on her behalf. Nevertheless, Craffy executed numerous high-risk unauthorized trades on Plaintiff's account without her prior consent, which resulted in substantial financial losses to Plaintiff of more than $200,000.

58.    As a financial advisor with the two securities firms, Craffy earned commissions tied to the volume of the securities trades he executed regardless of whether the trades were profitable for those he advised, such as Ms. Hartz.

59.    When Ms. Hartz and other Gold Star victims inquired about the financial health of their investment accounts, Craffy advised they refrain from checking their account statements and provided excuses for their poor financial performance.

60.    For example, during the COVID-19 Pandemic when she inquired about her investment performance, Craffy told Ms. Hartz not to worry herself by checking the accounts and that he would make any losses "up on the back-end."

61.    When Ms. Hartz questioned Craffy about the commissions she paid for his trades, he similarly told her, "Don't you worry about those charges. We will make them up in the back-end."

62.    As part of his scheme to defraud, Craffy induced Plaintiff and other victims to sign documents, which he had completed, which overstated their net worth, incorrectly described their investment profiles and risk tolerance, and misrepresented their retirement plans.

63.    On a separate occasion, a form prepared by Craffy misrepresented Plaintiff's retirement timeline. When Plaintiff alerted Craffy of the error and advised that she planned to retire within five to 10 years rather than 10 to 15 years, as the document described, he told her to sign anyway and that he would make the necessary correction.

64.    When Plaintiff agreed to allow Craffy to manage the majority of her survivor's benefits, as well as her savings and retirement accounts, approximately $500,000 in total, she described that her investment goals were modest, nevertheless, Craffy made high-risk trades with her accounts on which he received substantial commissions, resulting in a total loss of over $200,000.

65.    After the criminal and SEC cases were well underway, in or around December 2023, Plaintiff contacted Defendant Whistleblower Law Firm and inquired about the status of her case.

66.    On December 1, 2023, legal assistant Rolly Giberson advised Ms. Hartz that he had spoken with Defendant Attorney Khawam and that Ms. Hartz should direct all questions and updates to Attorney Stephen S. Stallings, an attorney licensed to practice in the Commonwealth of Pennsylvania and State of Florida because his office was responsible for handling her case.

67.     Plaintiff did not execute a retention agreement with Attorney Stallings; however, through a series of telephone conferences with Defendant Attorneys Khawam and Ripka and other Gold Star clients represented by Defendants, Ms. Hartz understood that Attorney Stallings was retained by Defendants to pursue FINRA arbitration on her behalf with Monmouth Capital and Newbridge Securities only.

68.     Defendant Attorney Khawam later explained to Plaintiff that Attorney Stallings had been retained by Defendants specifically because of his expertise in securities litigation.

69.     That same day, December 1, 2023, Ms. Hartz left a voicemail message for Attorney Stallings and sent him an email inquiring about the status of her case and informed him of the IRS charges she had incurred as a result of Craffy's withdrawals from her IRA.

70.     Attorney Stallings never responded to Ms. Hartz's December 2023 inquiries.

71.     On January 21, 2024, Attorney Stallings circulated a letter to Ms. Hartz and the other Gold Star victims represented by Defendants, stating that he would not be bringing securities claims on their behalf.

72.     In response to Defendant Attorney Stallings' withdrawal, Defendant Attorney Khawam sent an email to her Gold Star clients, including Plaintiff. The email reads in part, "Team, I'm sorry we all had to experience what we just did. I never in my career experienced such a thing, so I'm still in shock too. I'm already planning to find new counsel to substitute Steve's role."

73.     Neither at the time of Attorney Stallings' withdrawal or at any time thereafter did Defendant Attorney Khawam provide Plaintiff with any information as to the status of her potential claim against the US. Army.

13

74.    On April 18, 2024, Special Agent Dowling notified Plaintiff and other Gold Star victims that Craffy had entered into a guilty plea. In his email, he wrote in pertinent part, "If you don't have legal representation already, I would suggest looking for one to go after the other 'civil' avenues to try to recoup the money… That process is completely separate from the criminal investigation I have assisted on."

75.    On May 23, 2024, Plaintiff and Defendant Attorney Khawam signed a retention agreement with Attorney Bradford M. Gucciardo, an attorney licensed to practice in the State of Florida, for his representation of Plaintiff in all claims against Monmouth Capital only.

76.    Attorney Gucciardo's scope of representation, as outlined in the May 23 retention agreement, did not include Plaintiff's failure to supervise claim against the U.S. Army or a potential claim against Newbridge Securities, where Craffy had invested the majority of Plaintiff's money.

77.    On August 21, 2024, Craffy was sentenced to 151 months in prison and $1,482,741.41 in forfeiture.

78.    On September 4, 2024, Craffy consented to the entry of a judgment in the civil action brought by the Securities and Exchange Commission, permanently restraining and enjoining him from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934, Exchange Act Rule 10b-5, Section 17(a) of the Securities Act of 1933, and Rule 15*l*-1(a)(1) promulgated under the Exchange Act.

79.    On September 16, 2024, in a group email chain, other Gold Star victims represented by Defendants expressed frustration that Defendant Attorney Khawam had failed to complete sufficient work on their cases and expressed interest in finding new counsel.

80.    Defendant Attorney Khawam responded to her clients that same day. Her email reads,

> Dear All,
>
> As you may know my father passed away last week – this has been a very difficult time for me & my family.
>
> But to address your concern about Caz – what the US Attorney does in the criminal case is out of our hands – only they can run the criminal case against Caz. They are the prosecutors and only they have jurisdiction on that case.
>
> As for our work – we worked with the DOJ and the SEC and other federal agencies to successfully help get him sentenced.
> We also went to Congress and worked on legislation that was successfully passed too!
> It's evident that the financial side of the civil case is trivial because with [sic] the company went belly up. I understand your frustration because I too have worked and dedicated years to this case to help bring justice to you. I don't [sic] many attorneys that go through all the hoops that I go through to fight for my clients and expose wrongdoings so it [sic] doesn't happen again.
> As you know, this is not an easy case, and despite the obstacles we are still trying to pursue justice. When Steve Stalling [sic] quit, I had to interview many attorneys with this unusual skill set that would be willing to help.
> We want our clients to be happy, so it you aren't happy then please feel free to pursue other counsel – it's your right.
>
> As you know, we only want the best for everyone.
>
> Sincerely,
> Natalie

81.    Other than to claim that the "financial side of the civil case" was "trivial" and that she was "still trying to pursue justice," Defendant Attorney Khawam failed to provide any information about Plaintiff's claim against the U.S. Army.

82.    Ms. Hartz sustained a significant financial loss as a result of Craffy's fraudulent scheme and the U.S. Army's failure to supervise him in his role as a Financial Counselor for Gold Star families.

83.    On December 2, 2024, Ms. Hartz sent an email to Attorney Gucciardo inquiring about the status of her FINRA Statement of Claim against Monmouth Capital and copied Defendant Attorneys Khawam and Ripka.

84.    Attorney Gucciardo replied that he would be sending her the Statement of Claim later that week.

85.    On January 7, 2025, a judgment and order of restitution was entered against Craffy, awarding Gold Star victims approximately $4,000,000 in restitution.

86.    Plaintiff was awarded $214,242 in restitution.

87.    Craffy is not required to make restitution payments until his release from prison. Such payments are due in monthly installments of no less than $500. As of the date of filing this Complaint, Plaintiff has not received any restitution payments for any part of her loss.

88.    As Craffy does not possess assets he can liquidate in order to make significant restitution payments, it is unlikely that Ms. Hartz will be made whole.

89.    After having not received a copy of the Statement of Claim, on January 13, 2025, Plaintiff reached out to Defendant Attorney Khawam about her claim against the U.S. Army. Ms. Hartz' email reads in part, "I have been trying to get in touch with you regarding the status of our lawsuit against the Army concerning their liability in connection with the Caz Craffrey [*sic*] situation."

90.    During this same time period, Ms. Hartz also called Defendant Whistleblower Law Firm looking for Defendant Attorney Khawam and spoke with Defendant Attorney Ripka,

who suggested he knew nothing about her case or where Defendant Attorney Khawam could be located.

91.     Defendant Attorney Khawam responded to Plaintiff via email and advised that she contact Attorney Gucciardo, claiming that he was "lead counsel on the case."

92.     Plaintiff responded to Defendant Attorney Khawam and wrote in pertinent part, "I am referring to the lawsuit against the ARMY [*sic*] itself. I was under the impression you were handling that directly. When I spoke with Brad [Attorney Gucciardo], he had no idea about that aspect of the case and the last I spoke with him, he was going to be discussing it with you."

93.     After receiving Plaintiff's email, Defendant Attorney Khawam sent an email to Attorney Gucciardo, requesting to speak, and copied both Plaintiff and Defendant Attorney Ripka.

94.     Defendant Attorney Khawam's January 13, 2025 email reads in part, "Sharon & I need to speak with you regarding the statement of claims and a potential FTCA complaint against the Army too."

95.     Despite the fact that Ms. Hartz had retained Defendants to pursue her civil claim against the U.S. Army more than two years prior, this was the first time Defendant Attorney Khawam had attempted to address Plaintiff's claim against the U.S. Army.

96.     Attorney Gucciardo responded to Defendant Khawam's email and wrote in pertinent part, "I am not involved with the filing of any claims against the ARMY [*sic*], but I do believe those claims should be filed."

97.     By the time Defendant Attorney Khawam inquired with Attorney Gucciardo about the Federal Tort Claims Act complaint against the U.S. Army, the statute of limitations on Plaintiff's claim had expired.

98.     On January 24, 2025, Plaintiff sent an email to Defendant Attorneys Khawam and Ripka, inquiring about any developments in her case.

99.     On February 7, 2025, Plaintiff sent a second email to Defendants inquiring about the status of her case against the U.S. Army.

100.    Defendant Attorneys Khawam and Ripka never responded to Plaintiff's inquiries.

101.    On July 24, 2025, the Securities and Exchange Commission entered an order in its administrative proceedings, making findings and imposing remedial sanctions against Craffy. Pursuant to Section 15(b)(6) of the Exchange Act, Craffy was barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization. Craffy was also barred from participating in any offering of a penny stock.

## COUNT ONE – NEGLIGENCE (LEGAL MALPRACTICE)
### *Plaintiff v. All Defendants*

102.    Plaintiff incorporates by reference the averments set forth in Paragraphs 1 through 101 as though the same were fully set forth herein.

103.    Plaintiff retained Defendants to represent her in a civil action against the United States Army arising from its negligent supervision of United States Army Casualty Assistance Office and Survivor Outreach Services Financial Counselor, Caz Craffy.

104.    Defendants owed a duty to Plaintiff to represent her with the knowledge and skill that is expected of an attorney licensed to practice law in the States of Florida and New York, professing to specialize in military medical malpractice, qui tam, corporate fraud, and veterans' benefits litigation

105.    Defendants breached the standard of care by (1) failing to provide written notice of Plaintiff's claim to the United States Army pursuant to the Federal Tort Claims Act and (2)

failing to initiate litigation against the United States Army on behalf of Plaintiff within the statute of limitations.

106.    As a result of the aforementioned acts of negligence, Defendants caused Plaintiff to be precluded from successfully pursuing hundreds of thousands of financial damages in excess of $214,242 from the United States Army for the failure to supervise Craffy.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendants along with an award of compensatory damages, costs of suit, punitive damages, and any other relief that this Court deems just and proper.

### COUNT TWO – NEGLIGENT SUPERVISION
*Plaintiff v. Defendants Attorney Alan Ripka and the Whistleblower Law Firm*

107.    Plaintiff incorporates by reference the averments set forth in Paragraphs 1 through 106 as though the same were fully set forth herein.

108.    Defendant Attorney Alan Ripka is the senior partner of Defendant Whistleblower Law Firm.

109.    As the senior partner of Defendant Whistleblower Law Firm, Defendant Attorney Ripka was tasked with hiring and supervising the employees of the firm.

110.    Defendant Attorney Ripka owed a duty to Defendant Whistleblower Law Firm's clients to supervise Defendant Attorney Khawam to protect against acts of negligence.

111.    As senior partner of Defendant Whistleblower Law Firm, Defendant Attorney Ripka had a duty to supervise Defendant Attorney Khawam in her representation of six (6) Gold Star families, including Plaintiff, to ensure their claims against the United States Army were timely filed.

112.    Defendant Attorney Ripka breached the duty owed to Plaintiff by failing to supervise or monitor Defendant Attorney Khawam in her practice of law.

19

113.    As a result of Defendant Attorney Ripka's failure to supervise, Defendant Attorney Khawam's negligent and wrongful acts were permitted to occur and were not discovered in a timely manner. Most specifically, Defendants Attorney Ripka and the Whistleblower Law Firm failed to monitor Defendant Attorney Khawam in her representation of (6) Gold Star families, including Plaintiff, to ensure that their claims against the United States Army were timely filed.

114.    Had Defendant Attorney Ripka adhered to his duty to supervise Defendant Attorney Khawam, the damages sustained by Plaintiff could have been mitigated or avoided entirely.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendants along with an award of compensatory damages, costs of suit, punitive damages, and any other relief that this Court deems just and proper.

## COUNT THREE – BREACH OF FIDUCIARY DUTY
### *Plaintiff v. All Defendants*

115.    Plaintiff incorporates by reference the averments set forth in Paragraphs 1 through 114 as though the same were fully set forth herein.

116.    By agreeing to represent Plaintiff in a civil action against the United States Army, Defendants assumed fiduciary obligations owed to Plaintiff.

117.    Defendants owed Plaintiff a duty of loyalty and a duty to act in Plaintiff's best interests.

118.    At all times material hereto, Defendant Attorney Khawam acted in her capacity as an employee and agent of Defendants Whistleblower Law Firm and Khawam Law Firm.

119.    Defendant Attorneys Khawam and Ripka breached their fiduciary duties owed to Plaintiff by (1) failing to provide written notice to the United States Army of Plaintiff's claim

through the submission of Standard Form 95 or other written notice pursuant to the Federal Tort

Claims Act and (2) failing to initiate litigation against the United States Army within the statute

of limitations.

120.    As a result of the aforementioned acts of negligence, Defendants caused Plaintiff

to be precluded from successfully pursuing hundreds of thousands of financial damages in excess

of $214,242 from the United States Army for the failure to supervise Craffy.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendants along

with an award of compensatory damages, costs of suit, punitive damages, and any other relief

that this Court deems just and proper.

## COUNT FOUR – BREACH OF CONTRACT
*Plaintiff v. All Defendants*

121.    Plaintiff incorporates by reference the averments set forth in Paragraphs 1 through

120 as though the same were fully set forth herein.

122.    Plaintiff and Defendants entered into a contract whereby Defendants agreed to

represent Ms. Hartz in a civil action against the United States Army arising from its negligent

supervision of United States Army Casualty Assistance Office and Survivor Outreach Services

Financial Counselor, Caz Craffy.

123.    Defendants breached their agreement with Plaintiff by failing to preserve her

claim by providing written notice to the United States Army through the submission of Standard

Form 95 or other written notice pursuant to the Federal Tort Claims Act.

124.    As a result of the aforementioned acts of negligence, Defendants caused Plaintiff

to be precluded from successfully pursuing hundreds of thousands of financial damages in excess

of $214,242 from the United States Army for the failure to supervise Craffy.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendants along with an award of compensatory damages, costs of suit, punitive damages, and any other relief that this Court deems just and proper.

## DESIGNATION OF TRIAL COUNSEL

PLEASE TAKE NOTICE that Jack Meyerson, Esq., and Matthew Miller, Esq., are hereby designated as trial counsel for Plaintiff.

## JURY TRIAL DEMANDED

PLEASE TAKE NOTICE that Plaintiff demands a jury trial on all claims and issues so triable.

## CERTIFICATION

Pursuant to Rule 4:5-1, it is stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of our knowledge or belief. Also, to the best of our belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this pleading, we know of no other parties that should be joined in the above action.

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

Respectfully submitted,

Jack Meyerson, Esq.
Matthew Miller, Esq.
MEYERSON & MILLER
1600 Market Street, Ste. 1305
Philadelphia, PA 19103
(215) 972-1376

22